UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

GERTRUDE WILLISTON; and TAWANA, LATOYA,
and TANDIKA CUMMINS, by their parent,
PAULETTE CUMMINS, on their own behalf
and on behalf of all others similarly
situated,

                Plaintiffs,

    - and -

JOSE FELIZ, on his own behalf and on
behalf of all others similarly situated,

              Plaintiff-Intervenors

    - against -

VERNA EGGLESTON, as Commissioner of the
New York City Department of Social Services;
and ROBERT DOAR, as Commissioner of the
New York State Office of Temporary and
Disability Assistance,

              Defendants.

----------------------------------------X

04 Civ. 4454 (RWS)

O P I N I O N

...CALLY ... ...D: 7/29/05

A P P E A R A N C E S :

Attorneys for Plaintiffs:

    THE URBAN JUSTICE CENTER HOMELESSNESS OUTREACH
        PREVENTION PROJECT
    666 Broadway, 10th Floor
    New York, NY 10012
    By:  WENDY BACH, ESQ.
        MUNIR PUJARA, ESQ.
        Of Counsel

    NEW YORK LEGAL ASSISTANCE GROUP
    130 East 59th Street, 14th Floor
    New York, NY 10022
    By:  YISROEL SCHULMAN, ESQ.
        RANDAL S. JEFFREY, ESQ.
        ELISSA D. DEVINS, ESQ.
        Of Counsel

APPEARANCES CONTINUED ON FOLLOWING PAGE:

WELFARE LAW CENTER, INC.
275 Seventh Avenue, Suite 1205
New York, NY 10001
By:  MARC COHAN, ESQ.
     REBECCA L. SCHARF, ESQ.
     PETRA T. TASHEFF, ESQ.
     Of Counsel

Attorneys for Defendants:

HONORABLE ELIOT SPITZER
Attorney General of the State of New York
120 Broadway
New York, NY 10271
By:  DEBORAH HOCHHAUSER, ESQ.
     Assistant Attorney General
     Of Counsel

**Sweet, D.J.,**

Defendant Verna Eggleston, Commissioner of the New York City Human Resources Administration ("City Commissioner" or the "City") and Robert Doar, Commissioner of the New York State Office of Temporary and Disability Assistance ("State Commissioner" or the "State") (collectively, the "Defendants") have moved under Rule 12(b)(6) and 12(b)(1) to dismiss the putative class action complaint (the "Complaint") of Gertrude Williston ("Williston") and Tawana Cummins, Latoya Cummins and Tandika Cummins, by their parent Paulette Cummins (collectively the "Cummins") (collectively, the "Plaintiffs"). The Plaintiffs seek enforcement in this 42 U.S.C. § 1983 action of their rights under the Food Stamp Act ("FSA" or the "Act"), Public Law 88-525; 78 STAT. 703, alleging that the Defendants have a policy and practice of failing to provide food stamps to eligible individuals in a timely manner in violation of federal and state law, and that the State defendant has failed to properly oversee and supervise City defendant's administration of the Food Stamp program in violation of federal and state law.[1]

The City has moved to dismiss on grounds that the Plaintiffs do not have a private right of action and lack standing. The State has moved to dismiss on grounds of the Eleventh Amendment

---

[1] The caption of the complaint refers to the City defendant as the Commissioner of the New York City Department of Social Services ("DSS"). However, as correctly noted throughout the complaint, Eggleston is the Commissioner of the Human Resources Administration.

to the United States Constitution, failure of the Plaintiffs to state a claim and a prior action pending. Significant and difficult issues are thus presented.

For the reasons set forth below, the motions are denied.

## Prior Proceedings

Plaintiffs filed the Complaint on June 15, 2004, alleging that Defendants have a policy and practice of failing to provide food stamps to eligible individuals in a timely manner and, as such, seek enforcement of their rights under the FSA pursuant to 42 U.S.C. § 1983. The Defendants' motion to dismiss was heard and marked fully submitted on November 10, 2004.

## The Facts

The facts are set forth in the statements of the parties and are not in dispute except as noted below. All well-pleaded allegations are accepted as true for the purpose of this motion. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002). The following statements do not constitute findings of the Court.

The Complaint was filed on June 15, 2004, and identifies New York City residents who have applied for food stamps at Non-Public Assistance ("NPA") food stamp offices. (See Compl. at ¶¶

2

60, 81.)  It alleges that in New York City, individuals seeking to apply for food stamps may apply at either a Job Center or a NPA food stamps office and at Job Centers, and may also apply for cash assistance and/or medical assistance.  (See Compl. at ¶ 39.)  At NPA food stamp offices, applicants may only apply for food stamps. (Id.)  There are 32 Job Centers and 20 NPA food stamp offices located in the five boroughs of New York City.  (Id. at ¶ 40.)  The Plaintiffs in the instant action all applied for food stamps at NPA food stamp offices.  (See Compl. generally.)

According to the Complaint, the Plaintiffs are New York City residents who have applied for food stamps at NPA food stamp offices.  (See Compl. at ¶¶ 60, 81.)  Williston alleges that she is eligible for food stamps, and that she sought to apply for food stamps at an NPA office, but did not receive food stamps within 30 days of the date of application.  (Id. at ¶¶ 17, 59.)  The Cummins Plaintiffs allege that they were deterred, discouraged, and prevented from filing an application for food stamps upon initial contact at an NPA food stamps office, (id. at ¶ 21), and also failed to receive food stamps within 30 days of application.  (Id. at ¶ 88, 90.)

The Plaintiffs filed this action on behalf of themselves and a purported class defined as: "All New York City residents who have sought, are seeking, or will seek to apply for food stamps in New York City."  (Compl. at ¶ 10.)  Plaintiffs also bring this

action on behalf of a subclass defined as: "All New York City residents who have applied for food stamps in New York City and who have not had those applications processed within thirty days of application." (Compl. at ¶ 14.) The foregoing proposed class and subclass definitions do not differentiate where precisely the applications were sought -- whether at Job Centers or NPA food stamp offices.[2] (See Compl. at ¶¶ 10-13, 14.) In sum, Plaintiffs claim that their food stamp applications are not timely processed; that individuals are discouraged or prevented from applying for food stamp benefits; and that Defendants fail to provide expedited food stamp benefits. (See Compl. generally.)

According to the Complaint, Williston applied for food stamp benefits at Center 40, a NPA food stamp office, on January 30, 2004. (Id. ¶ 60.) On February 2, 2004, she received "expedited food stamps" for the period of January 30, 2004 to February 29, 2004. (Id. ¶ 61.) However, Williston claims that she did not receive "ongoing food stamps" and that on April 23, 2004 she requested a fair hearing with the State to challenge the City's failure to provide her with food stamps. (Id. ¶¶ 70, 71.) On May 19, 2004, a fair hearing was held and by Decision after Fair Hearing, dated May 26, 2004 ("DAFH"), the State directed the City

<hr/>

[2] One of Plaintiffs' proposed subclass definitions is limited to NPA food stamp offices: "All New York City residents who have sought, are seeking, or will seek to apply for food stamps in New York City at food stamp offices which do not accept applications for cash assistance, and who have been deterred, discouraged and prevented from filing applications and/or who have not received expedited food stamp benefits." (See Compl. at ¶ 3.)

to process Williston's food stamp benefit application and to restore all lost benefits resulting from the City's failure to provide Williston with food stamps within 30 days of her submitting the application. (<u>Id.</u> ¶¶ 71, 72.) At the time Williston filed this complaint, it was alleged she had not received any further food stamps. (<u>Id.</u> ¶ 73.) On June 23, 2004, Williston was authorized to receive food stamp benefits and these benefits were subsequently accessed. <u>See</u> Affidavit of Carolyn Karins, sworn to August 20, 2004 ("Karins Aff.") attached to notice of motion.

According to Cummins' Complaint, she went to apply for food stamp benefits in October 2003 at a NPA food stamp office located on Bergen Street in Brooklyn, New York, and the case worker refused to accept the application stating that Cummins' children were not eligible for food stamp benefits. (Compl. ¶ 81.)

On November 7, 2003, Cummins went back to the same NPA food stamp office wherein, although she claimed she was discouraged from applying for food stamps, her application was in fact filed. (<u>Id.</u> ¶¶ 83, 84.) On November 7, 2004, Cummins was told to return to the NPA food stamp center with the requested documentation by November 19, 2004. (<u>Id.</u> ¶ 85.) On November 13, 2003, she returned to the NPA food stamp office with the requested documentation and on November 14, 2003, she received "expedited food stamps" covering the period of November 7 to November 30, 2003. (<u>Id.</u> ¶¶ 86, 87.)

On January 13, 2004, Cummins received "ongoing food stamps." (Id. ¶ 90.)

**The Statutory Scheme**

The FSA, originally enacted August 31, 1964, as "The Food Stamp Act of 1964" is a complex federal funding statute that grants monies to the states for the operation of food stamp programs. See Public Law 88-525; 78 STAT. 703. The Secretary of Agriculture and state agencies are given express authority with respect to administration of the food stamp program; however, Congress solely vested the Secretary with overall enforcement of the Act. See 7 U.S.C. §§ 2013(a), 2024(a)(2004).

The provision of the Act entitled "Establishment of Program" provides:

> [T]he secretary is authorized to formulate and administer a food stamp program under which, at the request of the State agency, eligible households within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment ... .

Id. (internal citations omitted). Pursuant to 7 U.S.C. § 2013(c), the Secretary of Agriculture is further authorized to make such regulations as deemed necessary for effective administration of the Food Stamp Program. "The Secretary shall issue such regulations consistent with this Act as the Secretary deems necessary or

6

appropriate for the effective and efficient administration of the food stamp program . . ."  (Id. at § 2013.)

The section of the Act entitled "Violations and Enforcement" states:

> Notwithstanding any other provision of this Act the Secretary may provide for the issuance or presentment for redemption of coupons to such person or persons, and at such times and in such manner, as the Secretary deems necessary or appropriate to protect the interests of the United States or to ensure enforcement of the provisions of this Act or the regulations issued pursuant to this Act.

7 U.S.C. § 2024(a).

Section 2020 of the FSA governs the administration of the Food Stamp Program, and mandates, "The State agency of each participating State shall assume responsibility for the certification of applicant households and for the issuance of coupons and the control and accountability thereof."  7 U.S.C. § 2020(a). State agencies are also charged with improper denials and under-issuances of food stamp benefits.  See 7 U.S.C. § 2020(b).

The State agency is also responsible for reporting on its administration to the Food and Nutrition Service ("FNS").  See 7 C.F.R. § 275.3.  FNS conducts reviews to determine whether a State agency is operating the Food Stamp Program and the performance reporting system in accordance with program requirements.  Id.  A

7

federal reviewer and FNS regional offices will conduct reviews to examine state agency and project area operations, as considered necessary to determine compliance with program requirements.[3] See 7 C.F.R. 275.3. FNS shall notify the state of any deficiencies in program or system operations, and the state is given 60 days in which to respond to the findings of each review and to develop corrective action addressing all deficiencies detected in the operation of the program. Id. FNS also validates each state agency's payment error rate and under-issuance error rate, during each annual quality control review period. See 7 C.F.R. 275.3(c).

The Act also sets forth an enforcement mechanism in the event of non-compliance with the federal regulations:

> If the Secretary determines, upon information received by the Secretary, investigation initiated by the Secretary, or investigation that the Secretary shall initiate upon receiving sufficient information evidencing a pattern of lack of compliance by a State agency of a type specified in this subsection, that in the administration of the food stamp program there is a failure by a State agency without good cause to comply with any of the provisions of this Act, the regulations issued pursuant to this Act, ... the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure.

---

[3] Specifically, the regulation provides: "FNS shall conduct an annual review of certain functions performed at the State agency level in the administration/operation of the program. FNS will designate specific areas required to be reviewed each fiscal year. FNS will review each State agency's management evaluation system on a biennial basis; however, FNS may review a State agency's management evaluation system on a more frequent basis if a regular review reveals serious deficiencies in the ME system." 7 C.F.R. § 275.3(a)(b).

8

7 U.S.C. § 2020(g) (citations omitted). The state agency is given a specified period of time to correct such failure, and if the deficiency is not corrected, "the Secretary may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency[.]" Id. The Secretary is mandated to withhold funds from the state agency whether or not such matter has been referred to the Attorney General. Id.

In New York State, the Food Stamp Program is administered through 58 local social services districts, each of which is a county department, except for the New York City district (which comprises five counties). See New York Social Services Law ("NYSSL") § 95. The Office of Temporary and Disability Assistance ("OTDA") is the New York State agency which supervised the local district's administration of the Food Stamp Program. See NYSSL § 95; see also 18 NYCRR Part 387.

Under the State regulations, the local districts are responsible, inter alia, for conducting intake, processing applications for food stamps and making eligibility determinations. See 18 NYCRR §§ 387.2(e), (f), (h) and (i). State regulations also provide that the local districts shall "have applications readily available for potentially eligible households and provide an application to anyone requesting one." 18 NYCRR § 387.2(e). State regulations further provide that local districts "provide [appli-

9

cants] with the opportunity to apply for food stamps." 18 NYCRR §
387.2(h), (i).

Certain food stamp applicants are eligible for the
expedited processing of their application for food stamp benefits.
Expedited processing of the application for food stamp benefits is
generally available to households with low income and few resourc-
es, whose housing costs exceed their income and resources and
households that have certain migrant and seasonal workers. See 7
U.S.C. § 2020(e)(9)(A)(i)-(ii); see also 7 C.F.R. § 273.2(i)(1).
Under federal law, an applicant, if eligible, must receive the
expedited processing of their application for food stamp benefits
no later than seven days after the date of application. See 7
U.S.C. § 2020(e)(9). New York State regulations require that an
applicant, if eligible, receive the expedited processing of their
application for food stamp benefits within five days of the date of
application. See 18 NYCRR § 387.8(a)(2)(i)(a).

In New York City, applicants may apply for food stamp
benefits at a NPA food stamp office. (Compl. ¶ 39.) In addition,
a household may apply jointly for food stamp benefits and public
assistance at a job center. (Id.)

OTDA has supervised the local social services districts'
administration of the Food Stamp Program through, inter alia,
management evaluation reviews, see 7 C.F.R. Part 275(B), quality

10

control reviews, see 7 C.F.R. Part 275(C), regulations, administrative directives, informational letters and the fair hearing process. The fair hearing process represents an important aspect of the State's supervision of the local districts' compliance with program requirements. See Almenares v. Wyman, 453 F.2d 1075, 1087-88 (2d Cir. 1971), cert. denied, 405 U.S. 944 (1972).

State statute and regulations afford a food stamp applicant the right to a state administrative fair hearing (i.e., before OTDA) to challenge a local district's action with respect to his or her application, including a local district's alleged failure to timely process a food stamp application. See New York Social Services Law § 27; see also 18 NYCRR §§ 387.20(d), 358-6.4(a).

When the State's decision after fair hearing is adverse to the local district, the local district must comply with the decision. See 18 NYCRR § 358-6.4(a). If the applicant or recipient believes that the local district has failed to comply with the State's decision and wishes the State to secure the local district's compliance, he or she must submit a complaint to OTDA's Office of Administrative Hearing's Compliance Unit. See 18 NYCRR § 358-6.4(c). The Office of Administrative Hearing's Compliance Unit will thereafter "secure compliance by whatever means is deemed necessary and appropriate under the circumstances of the case." Id.

If, on the other hand, the State's decision after fair hearing is adverse to the applicant or recipient, he or she has the right to challenge the adverse decision after fair hearing by commencing a proceeding in New York State Supreme Court pursuant to New York Civil Practice Law and Rules Article 78.

## The Issues Presented

The City has challenged the existence of a private right of action under the FSA citing Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268 (2002). The State has urged an Eleventh Amendment bar to the Plaintiffs. Additionally, Defendants have challenged the Complaint for failure to state a claim based upon mootness and lack of standing. Because of the difficulty of the Gonzaga issue, see Kapps v. Wing., 404 F.3d 105 (2d Cir. 2005), it is appropriate to resolve the challenges to the Complaint before addressing the § 1983 issue.

## The 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)), although

"mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995) (quoting Scheuer v. Rhodes, 416 U.S. 232 (1974)). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.

Issues of contract interpretation "are generally matters of law and therefore [are] suitable for disposition on a motion to dismiss." Thayer v. Dial Indus. Sales, Inc., 85 F.Supp. 2d 263, 269 (S.D.N.Y.2000) (internal quotation marks and citation omitted); see also Lind v. Vanguard Offset Printers, Inc., 857 F.Supp. 1060, 1065 (S.D.N.Y. 1994). Furthermore, in deciding a motion to dismiss, the Court may consider exhibits to the complaint and documents incorporated in the complaint by reference. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002).

**State Defendant's Challenges to the Complaint**

## A. Plaintiffs Have Suffered Injury

According to the State Commissioner, neither Williston nor Cummins have suffered harm as a result of any conduct of the Defendants. Williston was successful in the DAFH process, and the OTDA directed the City to process her application for food stamps and to restore all lost benefits. According to the State Commissioner, Cummins failed to invoke the DAFH procedure and thus suffered no injury as a result of state action. Further, the State has raised a challenge to the Complaint on the basis of mootness and the prior action pending while the City has questioned the standing of the Plaintiffs.

### Plaintiff Williston

With respect to Williston, it is the position of the Plaintiffs that the State is obligated not only to provide a hearing procedure but to take any affirmative action necessary to provide that applicants receive the benefits of the FSA. Williston did not receive such benefits in the first instance and that obligation is not satisfied by the later action taken by the State.

The FSA is clear in its conferral of responsibility onto the State to administer, supervise, and review the distribution of

14

food stamp assistance to applicants at each local agency. Section 2012(n) defines the single state agency charged with the responsibility for administering the FSA as "the agency of the State government . . . which has the responsibility for the administration of the federally aided public assistance programs within the state" as well as the local agencies. 7 U.S.C. § 2012(n). The State must submit for approval a plan to the Department of Agriculture "specifying the manner in which [the Food Stamp program] will be conducted within the State in every political subdivision." 7 U.S.C. § 2020(d).

Under the FSA, each state must "permit an applicant household to apply to participate . . . on the same day that the household first contacts some food stamps office in person during office hours." 7 U.S.C. § 2020(e)(2)(B)(iii). The FSA also requires that once the application has been filed, the state must "promptly determine the eligibility of each applicant household by way of verification of income, . . . household size," and other factors. Id. at § 2020(e)(3). Moreover, the FSA imposes on each state a duty to "provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the verification process." Id. Finally, the FSA contains an unequivocal statutory mandate that the state provide food stamps to certain needy households on an expedited basis. Id. at § 2020(e)(9). See also Gonzalez v. Pingree, 821

15

F.2d 1526, 1528 (11th Cir. 1987) ("Title 7 U.S.C. § 2020(e)(9) speaks in imperative, not merely permissive, terms mandating that state agencies 'shall . . . provide coupons no later than five days after the date of application' to destitute applicants.") (citations omitted). As discussed below, each of the above requirements expressly applies to the State.

Further, the implementing regulations impose a duty on the State to supervise the City's acts or failures to act. Section 275.5(a) provides that "[e]ach State agency shall ensure that [local districts] operate the Food Stamp Program in accordance with the Act, regulations, and FNS-approved State Plan of Operation." 7 C.F.R. § 275.5(a). The same regulation requires the State to conduct periodic reviews of the City's performance so as to provide "a systematic method of monitoring and assessing program operations" and to provide "a basis for [local districts] to improve and strengthen program operations by identifying and correcting deficiencies." Id. § 275.5(a)(1) and (2). The further goal of the reviews is to provide "a continuing flow of information between the [local districts], the state, and FNS, necessary to develop the solutions to problems in program policies and procedures." Id. § 275.5(a)(3).

In addition, under the regulations, the State must engage in a regular program of "corrective action planning" to determine "appropriate actions to reduce substantially or eliminate deficien-

16

cies in program operations and provide responsive services to eligible households." 7 C.F.R. § 275.16(a). Food Stamp regulations further mandate that the "State agency shall ensure that corrective action plans are prepared at the project area [local district] level . . . The project area/management unit corrective action plans shall be open-ended and shall remain in effect until all deficiencies in program operations have been reduced substantially or eliminated." Id. at § 275.18(a).

The FSA and implementing regulations impose an enforceable duty on the State to supervise the City's administration of the Food Stamp program in New York City. The statute and regulations the Plaintiffs seek to enforce expressly benefit the Plaintiffs. For example, the statute and regulations speak in terms of ensuring that "the program provide responsive service to eligible households," 7 C.F.R. § 275.19(a), and correct deficiencies in program operations. Id. at §§ 275.5(a), 275.16(a).

The State thereby has a duty to ensure that Plaintiffs timely receive their food stamps.

## Plaintiff Cummins

With respect to the allegations of the Complaint regarding Cummins, the State has taken the position that her claims are precluded by a failure to exhaust.

17

Both the Supreme Court and the Second Circuit have repeatedly held that exhaustion of administrative remedies is not required for claims asserted pursuant to 42 U.S.C. § 1983. Patsy v. Board of Regents, 457 U.S. 496, 516 (1982); DeSario v. Thomas, 139 F.3d 80, 85-86 (2d Cir. 1998); Wilbur v. Harris, 53 F.3d 542, 544 (2d Cir. 1995). In Wilbur, the Second Circuit observed: "As the Supreme Court has clearly held, the 'exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to Sec. 1983.'" Id. at 544 (quoting Patsy, 457 U.S. at 516). In DeSario, the Court characterized the Patsy holding as a "categorical statement that exhaustion is not required" and as a reflection of an "expansive view of the federal role in protecting constitutional rights." Desario, 139 F.3d at 86. The Court in Reynolds III, evaluating the applicability of the exhaustion requirement under the FSA, observed:

> As discussed in the preceding section, the complaint asserts viable claims against the State defendants under 42 U.S.C. § 1983 for violations of federal law. This Court has already observed that exhaustion of administrative remedies is not required for such claims under Section 1983. See Reynolds I, 35 F. Supp. 2d at 341 n.9 (citing Wilbur v. Harris, 53 F.3d 542, 544 (2d Cir. 1995); Jose P. v. Ambach, 669 F.2d 865 (2d Cir. 1982)); see also Patsy v. Board of Regents, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) ("exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to §§ 1983"); DeSario v. Thomas, 139 F.3d 80, 85-86 (2d Cir. 1998), vacated and remanded on other grounds by Slekis v. Thomas, 525 U.S. 1098, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999) (same); Roberson, 2000 WL 760300, at *11 (Although both the Food Stamp Act and Medicaid statute require States to provide for administrative hearings when requested by recipients, the State defendants fail to point out any indication of congressional intent to

require exhaustion of such remedies prior to bringing a Section 1983 action.").

118 F.Supp. 2d 352, 383-84 (S.D.N.Y. 2000).

As the First Circuit held in <u>Commonwealth of Mass. v. Lynq</u>, 893 F.2d 424, 427 (1st Cir. 1990), "the scheme of the food stamp statute does not require exhaustion." Nor do the statutes and regulations on which the State relies impose any such require- ment. To be sure, section 2020(e)(10) requires the State to provide a fair hearing to households aggrieved by actions of the state agency, but nowhere does that statute require or discuss exhaustion of the fair hearing option as a condition of enforcing the FSA. <u>See</u> 7 U.S.C. § 2020(e)(10).

Moreover, the State's duty to supervise the City is not dependent on the Plaintiffs' choice to utilize the administrative review process. As <u>Reynolds III</u> noted:

The State defendants contend that one primary way in which the State implements the Food Stamp and Medicaid Acts is by providing applicants and recipients with the right to administrative fair hearings to redress their grievances with local agency actions. The State defen- dants argue that the majority of plaintiffs have failed to avail themselves of the fair hearing process, and therefore cannot allege that the State defendants failed to supervise.

The Court rejects this argument. As discussed above, plaintiffs are not required to exhaust their administrative remedies. Additionally, the State defendants have an independent duty to investigate the City defendants' performance and act in an ongoing

19

oversight capacity to ensure their compliance with federal mandates separate and apart from the fair hearing process.

Reynolds III, 118 F. Supp. 2d at 386.

## B.    **Plaintiffs Claims Are Not Moot**

The State has urged that the Plaintiffs' claims are moot, food stamps having been received.

However, even if it is assumed that Williston received her food stamps on June 23, 2004, she did so five days after the motion for class certification was filed and seven days after the filing of the Complaint.  As the Second Circuit has observed:

> the fact that the plaintiffs received their unlawfully delayed benefits after the lawsuit was commenced did not mean that the action thereby became moot.  Where class claims are inherently transitory, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  Even where the class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy.

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993).  See also Comer v. Cisneros, 37 F.3d 775, 790 (2d Cir. 1994).

The Cummins' claims are not moot since they are seeking food stamps for the period from October 2003 through January 2004.

20

Accordingly, they are still entitled to an order requiring the City to process their application effective October 2003. As Reynolds III noted, this claim "is for injunctive relief, not for retroactive money damages," 118 F. Supp. 2d at 392, and therefore the claim is not moot.

## C. **No Bar To Suit Due To Prior Pending Action**

The State has argued that this action is barred by a prior class action pending in this district before the Honorable William H. Pauley, III, 35 F. Supp. 2d 331 (S.D.N.Y. 1999) (Reynolds I); Reynolds v. Giuliani, 98 Civ. 887 (S.D.N.Y., Pauley, J.) (Reynolds II); 118 F. Supp. 2d 352 (S.D.N.Y. 2000) (Reynolds III).

The Plaintiffs in Reynolds are challenging, among other things, the City and State's alleged policies and practices of deterring, discouraging, and preventing individuals from filing applications for and receiving food stamps from Job Centers.

The representative class of plaintiffs in Reynolds is comprised of:

> All New York City residents who have sought, are seeking, or will seek to apply for food stamps, Medicaid, and/or cash assistance from City defendants at Job Centers.

Reynolds Complaint ¶ 61.

Here, the proposed class consists of:

>All New York City residents who have sought, are seeking, or will seek to apply for food stamps in New York City.

Complaint ¶ 10.  The subclasses consist of:

>All New York City residents who have applied for food stamps in New York City and who have not had those applications processed within thirty days of the date of application.

Id. ¶ 14; and

>all New York City residents who have sought, are seeking, or will seek to apply for food stamps in New York City at food stamps offices which do not accept applications for cash assistance, and who have been deterred, discouraged and prevented from filing applications and/or who have not received expedited food stamp benefits.

Id. ¶ 18.

Included in the relief requested by the plaintiffs in Reynolds is a declaration that OTDA has a policy and practice of failing to process all applications for food stamps, including expedited food stamps, within the time frames required by law; that OTDA fails to properly oversee the City's administration of the Food Stamp program in violation of Plaintiffs' rights under federal and state law and the Due Process Clause of the United States Constitution; to enjoin OTDA to refrain from discouraging and

deterring Plaintiffs and Plaintiff class members from filing applications for food stamps, including applications for expedited food stamps, and to require the processing of all food stamp applications, including expedited food stamps, within the time frames required by law; and to oversee and supervise the administration of the Food Stamp Program by HRA to ensure that Plaintiffs and Plaintiff class members are not deterred, discouraged, or prevented from applying for food stamps.

However, despite this specific attention to food stamp distribution, the general focus of Reynolds challenged the City's conversion of traditional welfare offices, where applications for cash assistance and related benefits could be filed, to Job Centers.

In Reynolds, plaintiffs asserted, as part of the process of converting welfare centers to Job Centers, that defendants engaged in a pattern and practice of

> providing applicants with false and misleading information in an effort to prune the welfare rolls. Plaintiffs further allege that the City defendants are impermissibly raising impediments to applications by needy individuals for food stamps, Medicaid and cash assistance.

Reynolds I, 35 F. Supp. 2d at 336. Consequently, the Court issued relief that focused on the right of applicants at Job centers to file applications and to receive, where eligible, expedited

service. Specifically, Judge Pauley ordered relief, exclusively covering Job Centers, that, _inter alia_, directed the City to:

> 1. allow plaintiffs and all persons applying for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants to apply for such benefits on the first day that they visit a Job Center;
>
> 2. process all applications for expedited food stamps and temporary pre-investigation grants at Job Centers within the time frames required by law.

_Reynolds II_, 118 F. Supp. 2d at 358.

Only one claim in this action concerns the City's conduct at Job Centers, failure to timely process applications for ongoing food stamps, and that claim was not implicated by the Job Center conversion process. The _Reynolds_ complaint contains twelve causes of action, but none allege delays in the processing of food stamp applications at Job Centers.

To the extent that the relief sought in the _Reynolds_ complaint contains language addressing timely processing, that language, as indicated by the Complaint, concerns the front-end process of permitting persons to submit the application on the first day they seek assistance and to provide expedited food stamp service to eligible applicants. Indeed, paragraphs 84 through 89 of the Complaint describe the "delay" in processing applications and concern the ability to have the application accepted for

processing and not the overall time taken in processing the application.

The three Reynolds decisions were concerned only with violations of law that arose during the period from the time the plaintiffs sought to file an application through the initial processing phase when applications were withdrawn or modified, emergency benefits issued or denied, and concomitant notices issued. See Reynolds I, 35 F. Supp. 2d at 331; Reynolds II, 43 F. Supp. 2d at 492; Reynolds III, 118 F. Supp. 2d at 352.

As Judge Pauley carefully noted:

> After drawing the sample, the City utilized a new audit instrument to review the sampled case files and measure performance in the following areas: (a) providing immediate needs cash assistance where appropriate; (b) providing expedited food stamp service where appropriate; (c) timely providing immediate needs and expedited food stamps; and (d) making separate determinations or referrals for food stamps or Medicaid where cash assistance was denied or the application was withdrawn. ... Additionally, the instrument sought to determine whether a notice of benefit determination was issued to an applicant.

Reynolds III at 364. Here, the Plaintiffs seek an order finding that "Defendants' policies and practices of failing to provide ongoing food stamps to eligible individuals and families within thirty days of the date of application violates 7 U.S.C. § 2020(e)(3) and 7 C.F.R. § 273.2(a)(2), (g)(1)." See Compl., First

25

Claim Against Defendants.   Therefore, <u>Reynolds</u> is not a prior action which precludes the relief sought here.

## City Defendant's Challenges to the Complaint

### A.   Plaintiffs Do Not Lack Standing

The City has also sought dismissal on the grounds that the Plaintiffs lack standing.   The City has appropriately noted that "The party invoking federal jurisdiction bears the burden of establishing the elements of standing." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).   Pursuant to Article III of the United States Constitution, a plaintiff must establish: "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." <u>United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.</u>, 517 U.S. 544, 551 (1996); <u>accord</u> <u>St. Pierre v. Dye</u>, 208 F.3d 394, 401 (2d Cir. 2000). Courts have interpreted the "case" or "controversy" language of Article III of the United States Constitution to require that a plaintiff seeking to invoke federal jurisdiction have standing to sue.   <u>Lujan</u>, 504 U.S. 555, 561.

A plaintiff cannot rely on conclusory allegations of injury to establish standing to sue.   <u>See</u> <u>Tasini v. New York Times Co., Inc.</u>, 184 F. Supp. 2d 350, 2001 U.S. Dist. LEXIS 1141, at *10

26

(S.D.N.Y. 2002). "[I]t is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings.'" Id. (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990)).

There are 32 Job Centers and 20 NPA food stamp offices located in the five boroughs of New York City. The Plaintiffs are individuals who have applied for food stamps at NPA food stamp offices. See Compl. at ¶¶ 60, 81. The Complaint does not identify any named individuals who have applied for food stamps at any of the 32 Job Centers throughout the City. According to the City, the Plaintiffs do not have standing to allege an injury to themselves, or on behalf of others, to the extent that such a claim pertains to Job Centers.

However, here the Plaintiffs do not seek to certify a class of food stamp applicants suffering delays at Job Centers and a separate class of food stamp applicants suffering delays at non-Job Center sites. Rather, Plaintiffs seek to certify a sub-class of applicants defined as "[a]ll New York City residents who have applied for food stamps in New York City and who have not had those applications processed within thirty days of the date of application." (Compl. at ¶ 14.) The FSA would permit no such application differentiation based on place of filing since even if the cash assistance application is denied or withdrawn, the applicant cannot be required to submit a new application for food stamps. See 7

27

U.S.C. §§ 2014(b), 2020(e)(1)(B)(i), 2020(e)(3); 7 C.F.R. § 273.2(g)(1).

The City's contention, taken in its logical extreme, would require consideration of each individual office where applications are processed. This Court has previously rejected an attempt to draw such distinctions in the context of Medicaid delays. In Kessler v. Blum, 591 F. Supp. 1013 (S.D.N.Y. 1984), five New York City residents sued on behalf of a state-wide class to challenge delays in processing applications for prior approval of certain Medicaid services. Defendants sought to limit the class to only residents of New York City. This Court rejected the motion, even though none of the named plaintiffs resided outside New York City. Id. at 1033; see also Robertson v. Jackson, 766 F. Supp. 470, 473-75 (E.D. Va. 1991) (Court found for a state-wide plaintiff class despite significant differences in performance among local offices.)

The Plaintiffs seek on behalf of a city-wide class of food stamp applicants to compel Defendants to timely process applications and therefore have standing to represent the class regardless of where the application is filed.

For the reasons set forth above, the motion to dismiss the Complaint is denied on the preliminary grounds advanced by the

Defendants: lack of injury, mootness, the existence of prior lawsuit, and standing.

## B. There Is A Private Right Of Action To Enforce The FSA

As has already been noted, the City has raised the difficult issue as to whether the FSA creates a private right of action enforceable under 42 U.S.C. § 1983. The Second Circuit in Kapps v. Wing, 404 F.3d 105 (2d Cir. 2005), has already noted the issues and the authorities while considering the Low Income Home Energy Assistant Act ("LIHEAA"), stating:

> The question of whether § 8624(b)(13) of the LIHEAA creates rights that are enforceable under § 1983 is not an easy one. On the one hand, as the plaintiffs point out, § 8624(b)(13) has many of the characteristics that the Supreme Court has identified as important to the creation of privately enforceable statutory rights. See, e.g., Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 430 (1987); Wilder v. Virginia Hosp. Ass'n, 497 U.S. 498, 509 (1990); Blessing v. Freestone, 520 U.S. 329, 341 (1997); see also Marshall v. Switzer, 10 F.3d 925, 929 (2d Cir. 1993). On the other hand, the Court has appeared to be increasingly reluctant to find § 1983-enforceable rights in statutes which, like the LIHEAA, set forth their requirements in the context of delineating the obligations that accompany participation in federal spending clause programs. See, e.g., Suter v. Artist M., 503 U.S. 347, 358 (1992); Gonzaga Univ. v. Doe, 536 U.S. 273, 280, 287 (2002). In the aftermath of the Court's decision in Gonzaga University, our circuit has not yet established a unified approach to provisions contained in spending clause statutes such as the LIHEAA. Compare Taylor v. Vermont Dep't of educ., 313 F.3d 768, 786 (2d Cir. 2002) (finding post-Gonzaga, that § 1232g(a) of the Family Education Rights and Privacy Act did not create § 1983 enforceable rights), with Rabin v. Wilson-Coker, 362 F.3d 190, 202 (2d Cir. 2004) (finding that §

1396r-6 of the Medicaid Act did create § 1983 enforceable rights).

Given the difficulty of the question, and the fact that the district court's ruling on the LIHEAA/§ 1983 issue was not necessary to its grant of injunctive relief, we decline to decide at this time whether § 8624(b)(13) creates privately enforceable rights.

Id. at 127.

Because it has been concluded as set forth above that the Plaintiffs have appropriately alleged an injury, it is necessary to resolve whether the Plaintiffs have a private right of action. Each of the statutory and regulatory provisions at issue in this action meet the three-prong test for federal court enforceability set forth by the Supreme Court in Blessing v. Freestone, 520 U.S. 329 (1997), and reaffirmed in Gonzaga Univ. v. Doe, 536 U.S. 273 (2002). Gonzaga articulates the difference between those statutes giving right to section 1983 claims and those that do not. Citing specifically to its decision in Wright v. Roanoke Redev. Hous. Auth., 479 U.S. 418 (1987), and Suter v. Artist M., 503 U.S. 347 (1992), as well as Blessing, the Court in Gonzaga stated the question is whether the statute confers, "a mandatory [benefit] focusing on the individual." Gonzaga at 280.

The Gonzaga Court restated the Blessing test, which provides that:

30

> To determine whether a private right of action exists under a federal statute, a plaintiff must show that the statute is: (1) intended to benefit the plaintiff seeking to enforce it; (2) a binding obligation on the governmental unit, rather than merely a congressional preference for a certain kind of conduct; and (3) not so vague and amorphous as to be beyond the competence of the judiciary to enforce.

Blessing, 520 U.S. at 340.

In examining another federal benefit program intended to aid the nation's neediest families, the Medicaid Act, the Second Circuit held that 42 U.S.C. § 1396r-6(a) is enforceable under section 1983. See Rabin v. Wilson-Coker, 362 F.3d 190, 201 (2d Cir. 2004). Section 1396r-6(a) provides that "each State plan approved under this sub-chapter must provide that each family which was receiving ["AFDC"] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for aid, because of . . . income from employment . . . remain eligible for assistance under the plan . . . during the immediately succeeding 6 month period." 42 U.S.C. § 1396r-6(a). The Rabin court, in analyzing whether an enforceable right existed, examined the statutory provision's "language, the context in which the language is used, and the broader context of the statute as a whole." Rabin, 362 F.3d at 196 (quoting Freir v. Westinghouse Elec. Corp., 303 F.3d 176, 197 (2d Cir. 2002), cert. denied, 538 U.S. 998 (2003)). Further, in evaluating whether the Medicaid provision had "rights-creating" language, the Rabin court examined whether the text of the Medicaid provision is "phrased in terms of

the persons benefitted," (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692 n.13 (1979)), and held that the language of 42 U.S.C. § 1396r-6 "focuses much more directly than does the [Family Educational Rights and Privacy Act] provision on the individual's entitlement." Rabin, 362 F.3d at 201.

Rabin rejected the defendant's argument that the wording of 42 U.S.C. § 1396r-6(a), which requires that the State Plan provide eligible applicants with aid rather than directly requiring that all eligible individuals receive assistance, means that "Congress focused on the aggregate and the responsibilities of various administrative actors rather than the rights of recipients." Id. at 201-02. The Rabin court further rejected defendant's argument by pointing to 42 U.S.C. § 1320a-2, another provision of the Medicaid Act which provides that "[i]n an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." Id. at 202.

The provisions of the FSA here appear to relate to the individual household that applies for benefits just as the provisions of the Medicaid Act at issue in Rabin with respect to a specific relief to a specific class of beneficiaries and time

frames within which eligible households must receive the benefits provided.

Rather than having an "aggregate focus," the FSA does establish specific rights for individual households applying for food stamps and for eligible households to receive food stamps in a timely manner.

Twice before in this Circuit, using a <u>Blessing</u> analysis, courts have found subsections 2020(e)(2)(B)(iii), 2020(e)(3) and 2020(e)(9) of the FSA,[4] the provisions of the FSA at issue in <u>Williston</u>, to confer enforceable rights. In <u>Reynolds v. Giuliani</u>, Judge Pauley in a careful and complete opinion held that 7 U.S.C. §§ 2020(e)(2)(B), (e)(3) and (e)(9), the exact same provisions of the FSA involved here, as well as provisions of the Medicaid Act, create rights enforceable under § 1983. <u>Reynolds I</u>, 35 F. Supp. 2d at 340-41. Applying the <u>Blessing</u> test, <u>Reynolds I</u> found that Congress "undoubtedly intended to benefit individuals such as the

---

[4] Section 2020(e)(3) mandates defendants to provide food stamps to eligible households within thirty days of application: [T]he State agency shall thereafter promptly determine the eligibility of each applicant household ... so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application." Section 2020(e)(9) directs defendants to provide expedited food stamps to eligible households within seven days of application. Section 2020(e)(2)- (B)(iii) directs defendants to allow applicant households to apply immediately for food stamps upon initial contact with a food stamp office: "[T]he State agency shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a food stamp office during office hours."

plaintiffs" and held that the FSA provisions imposed unambiguous obligations on State agencies. Id.; see also Reynolds III, 118 F. Supp. 2d at 383 (finding provisions of the Food Stamp and Medicaid Acts enforceable under § 1983).

Similarly, in Roberson v. Giuliani, the court held that provisions of the Food Stamps Act at issue in this action, including 7 U.S.C. § 2020(e)(2)(B) (application upon initial contact with food stamp office) and 7 U.S.C. § 2020(e)(9) (mandating a seven day time frame for emergency food stamps), were enforceable under § 1983. Roberson v. Giuliani, No. 99 Civ. 10900 (DLC), 2000 WL 760300, *11 (S.D.N.Y. Jun 12, 2000). The Roberson court applied the Blessing test and found "[t]hat these provisions of the FSA were enacted by Congress in order to protect the intended recipients of food stamps is not open to serious doubt. Furthermore, these provisions impose unambiguous obligations on State agencies." Id.[5]

Gonzaga observes that "[T]he State may rebut [a] presumption [of enforceable rights] by showing that Congress

_____

[5] Other pre-Gonzaga cases utilizing a Blessing-type analysis have found these same provisions enforceable. See, e.g., Gonzalez v. Pingree, 821 F.2d 1526, 1531 (11th Cir. 1987) (holding that plaintiff is entitled to pursue § 1983 action for redress of violation of her right to expedited food stamps); Victorian v. Miller, 813 F.2d 718, 723-24 (5th Cir. 1987) (en banc) (holding that applicants for expedited food stamps could bring § 1983 action to enforce state compliance with Act's requirements); Pa. Food Merchants Assoc. v. Houston, 999 F. Supp. 611, 619-20 (M.D. Pa. 1998) (holding that 7 U.S.C. § 2016(g)(2) is enforceable under § 1983).

'specifically foreclosed a remedy under § 1983.'" The State's burden is to demonstrate that Congress shut the door to private enforcement either expressly, through "specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under §§ 1983," Gonzaga, 536 U.S. at 285, n.4 (citations omitted.)

The City has cited Taylor v. Vermont Dep't of Educ., 313 F.3d 768 (2d Cir. 2002), Ass'n of Comm. Org. for Reform Now v. NYC Dep't of Educ., 269 F. Supp. 2d 338 (S.D.N.Y. 2003). Taylor, like Gonzaga, involved claims under the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1282(g). The Second Circuit followed Gonzaga's reasoning in finding that a different provision of FERPA, the records-access provision, similarly did not confer rights on parents and, therefore, did not create an enforceable right. Taylor, 313 F.3d at 785. In Community Organizations, the court found that certain sections of the No Child Left Behind Act ("NCLBA") did not create individual rights enforceable under § 1983. 269 F. Supp. 2d at 344-47. The court, however, held that a statute does create an enforceable right if it "focuses on conferring a benefit or entitlement on an individual or a class of individuals and does not focus on the entity or person that the statute intends to regulate." Id. at 344. As discussed above, the FSA has the kind of rights conferring provision envisioned by this language.

The City also has relied upon two district court decisions from other circuits, Community Organizations, 269 F. Supp. 2d at 345-46, and Almendares v. Palmer, No. 3:00 CV 7524, 2002 WL 31730963, *5 (N.D. Ohio Dec. 3, 2002), for the proposition that Congress's designation of the Secretary of Agriculture to handle violations of the FSA under 7 U.S.C. § 2020(g) indicates that Congress did not intend to grant any individually enforceable rights. However, the FSA requires that state agencies provide "for the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the state agency under any provision of its plan of operation." 7 U.S.C. § 2020(e)(10). This fair hearing provision is exactly the kind of individualized administrative remedy that constitutes evidence of Congressional intent to create an enforceable rights. In Sabree v. Richman, 367 F.3d 180 (3d Cir. 2004), and Kapps v. Wing, 283 F. Supp. 2d 866 (E.D.N.Y. 2003), the courts held that the existence of a fair hearing provision in a statute is not an enforcement scheme comprehensive enough to preclude action under 1983.

Further, Almendares acknowledged that "[t]he administrative scheme is only evidence of Congress' intent not to create an individually enforceable private right. The administrative scheme in the Food Stamp Act is not the type of remedial scheme sufficiently comprehensive to supplant a 1983 claim." 2002 WL 31730963, *5 n.4.

36

The <u>Almendares</u> court addressed only 7 U.S.C. § 2020(e)-
(1)(B), which governs the obligation of the State agency to hire
bi-lingual personnel and use language-appropriate materials and
reasoned that 7 U.S.C. § 2020(e)(1)(B) has an "aggregate focus" and
"is not concerned with whether the needs of any particular person
has been satisfied," and that "[t]his provision is simply intended
to ensure that the State plan of operation includes provisions to
deal with counties with high populations of low income households
whose language is other than English." <u>Id.</u> at *5.

Finally, post-<u>Gonzaga</u>, courts have held that Congress's
establishment of an enforcement mechanism in a statute does not
preclude the existence of rights that are enforceable under § 1983.
In <u>Sabree</u>, 367 F.3d at 192, observing that the Medicaid Act lacked
provisions explicitly precluding individual actions, the Third
Circuit found that "[t]he burden to demonstrate that Congress has
explicitly withdrawn the remedy is on defendant," and that a court
should not "lightly conclude that Congress intended to preclude
reliance on § 1983 as a remedy" for deprivation of a conferred
right. <u>Id.</u> (quoting <u>Golden State Transit Corp. v. City of Los</u>
<u>Angeles</u>, 493 U.S. 103, 107 (1989)) (citations omitted). Looking at
the Medicaid Act, which has a fair hearing provision similar to
that in the FSA, the <u>Sabree</u> court found that the Medicaid Act did
not have comprehensive enforcement mechanisms intended to preclude
an enforceable right and held "that [if] Congress provides a remedy
for itself for non-compliance[, it] does not necessarily preclude

a coherent and coexisting intent to create an enforceable right in individual beneficiaries." Id. at 193.

In another post-Gonzaga case, Kapps v. Wing, 283 F. Supp. 2d 866 (E.D.N.Y. 2003), the district court examined whether 42 U.S.C. §§ 8624(b)(5) and (b)(13) of the HEAP statute contain rights that are enforceable under § 1983. Kapps, 283 F. Supp. 2d at 866. The Kapps court examined the language of the involved provisions that directed the state to provide timely issuance of heating assistance to specific low-income individuals, see 42 U.S.C. § 9624(b)(5), and directs the state to provide fair hearings for individuals to compel timely processing, see 42 U.S.C. § 8624(b)-(13), finding that the provisions had "rights-creating" language. Kapps, 283 F. Supp. 2d at 880. In addition, the court held that the HEAP statute, which has fair hearing and funding withdrawal provisions, did not have a sufficiently comprehensive enforcement scheme so to preclude action under § 1983. "Courts in this [Second] circuit have found a private right of action where . . . the relevant federal statute contains a funding withdrawal provision." Id. at 880.

As these authorities indicate, the reasoning of Judges Pauley and Gershon in Reynolds I and III and Kapps is adopted here. Rather than focusing on the "aggregate," the provisions discussed above speak in terms of each individual applicant household's right to apply for food stamps upon initial contact with a food stamp

center and the eligible household's right to receive expedited and ongoing food stamps in a timely manner.

The regulations at issue in this action define enforceable statutory rights that are themselves enforceable rights through § 1983. <u>See</u> <u>Reynolds III</u>, 118 F. Supp. 2d at 382, n.32. Section 271.2(g)(1) establishes: "The State agency shall provide eligible households that complete the initial application process an opportunity to participate . . . as soon as possible, but no later than 30 calendar days following the date the application was filed . . . ." 7 C.F.R. § 273.2(g)(1). Section 273.2(i)(3)(I) further elaborates that, "[f]or households entitled to expedited service, the State agency shall make available to the recipient coupons or an ATP card not later than the seventh calendar day following the date an application was filed." 7 C.F.R. § 273.2(i)-(3)(I). Finally, Section 274.2(e)(2)(I) directs that "State agencies shall encourage households to file an application form the same day the household or its representative contacts the food stamp office in person or by telephone and expresses interest in obtaining food stamps assistance or expresses concern which indicates food insecurity." 7 C.F.R. § 274.2(e)(2)(I). Each of these regulations do nothing more than carry forward already explicit statutory mandates.

These authorities support the conclusion that the Plaintiffs have an enforceable private right of action under the FSA.

## The Eleventh Amendment Does Not Bar This Action

The State has contended that the Plaintiffs' requests for declaratory relief seek "retrospective relief" barred by the Eleventh Amendment. However, where Plaintiffs allege an ongoing violation of federal law, prospective relief may take the form of declaratory as well as injunctive relief. A declaration for past wrongs may be appropriate, since such relief does not seek to impose a monetary loss upon the State for past conduct. Further, as the Complaint seeks the reprocessing of food stamp applications over the period of time during which class members' benefits were wrongly denied, this request for relief constitutes a request for injunctive relief, "not retroactive money damages." Reynolds III, 118 F. Supp. 2d at 392. Therefore, "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction." Aiken v. Nixon, 236 F. Supp. 2d 211, 227-28 (N.D.N.Y. 2002) (quoting Verizon Maryland, Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 646 (2002)).

The State has sought to rely upon Green v. Mansour. The Green court specifically premised its holding that the Eleventh Amendment barred declaratory relief on the lack of any allegation

40

of continuing violation of federal law. <u>Green v. Mansour</u>, 474 U.S. 64, 73 (1983) ("We think that these cases demonstrate the impropriety of the issuance of a declaratory judgment in this case. There is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction."). Here, the Plaintiffs claim ongoing violation of federal law, rendering their declaratory relief request permissible under the Eleventh Amendment.

Judge Pauley in <u>Reynolds III</u> carefully considered the appropriate authorities rejecting the State Eleventh Amendment defense, explaining:

> Plaintiffs' claims against the State defendants fall squarely within the <u>Ex Parte Young</u> exception. <u>See</u> <u>Reynolds I</u>, 35 F. Supp. 2d at 340 n.8 ("the Court observes that official-capacity actions seeing prospective injunctive relief for alleged violations of federal law are not treated as actions against the State."). Plaintiffs have named state officials, not the state itself, as defendants. (Compl. ¶¶ 16-19) Plaintiffs allege that the state officials are violating and continuing to violate federal laws, including the Fourteenth Amendment to the Constitution, the Food Stamp Act, 7 U.S.C. § 2020 <u>et seq.</u>, and the Medicaid Act, 42 U.S.C. § 1396. [FN30][6] (Compl. ¶¶ 255-61, 263-66) Plaintiffs seek prospective injunctive relief, and not retroactive money damages, against the State defendants.

---

[6] FN30. The State defendants contend, and plaintiffs deny, that plaintiffs have sued them for violations of State law. <u>See</u> State Defs.' Suppl. Mem. at 21-23; Pls.' Suppl. Mem. at 28 n.16 Although the complaint appears to plead State law claims only against the City defendants, <u>see</u> Compl. ¶ 262, to the extent that plaintiffs' requested relief is premised on the State defendants' violations of State law, <u>see</u> Compl. Relief for Request ¶¶ b (viii), c.(i), such relief is barred by the Eleventh Amendment. <u>See</u> <u>Pennhurst</u>, 465 U.S. at 104-06 S.Ct. at 910-11.

41

[FN31][7] See Roberson v. Giuliani, *382 2000 WL 760300, at *9-10 (S.D.N.Y. Jun. 12, 2000) (99 Civ. 10900(DLC)) (denying State officials' motion to dismiss claims for prospective injunctive relief for violations of the Food Stamp Act); Graus v. Kaladjian, 2 F. Supp. 2d 540, 542 (S.D.N.Y. 1998) (denying State defendant's motion to dismiss claims for prospective injunctive relief for violations of the Medicaid Act).

Relying on Pennhurst, 465 U.S. at 101, 104 S.Ct. at 908, and Seminole Tribe of Florida v. Florida, 517 U.S. 44, 75 n. 17, 116 S.Ct. 1114, 1133 n.17, 134 L.Ed.2d 252 (1996), the State defendants assert that the Ex Parte Young doctrine is inapplicable. This argument is unpersuasive.

Reynolds III, 118 F. Supp. 2d at 381-82.


There is no need to rehearse these authorities further, and Judge Pauley's reasoning is adopted. The State's motion to dismiss the Complaint on Eleventh Amendment grounds is denied.

---

[7] FN31. However, this Court reserves decision on whether, if such an issue arises, the State defendants are immune from a claim for retroactive money damages to the extent the federal government will reimburse the State for a retroactive money judgment. See generally Bennett v. White, 865 F.2d 1395, 1407-08 (3d Cir. 1989); Bermudez v. Dep't of Agric., 490 F.2d 718, 721-24 (1973); Harrington v. Blum, 483 F. Supp. 1015, 1021-22 (S.D.N.Y. 1979); Conrad v. Perales, 92 F. Supp. 2d 175, 180-81 (W.D.N.Y. 2000).

## Conclusion

Based upon the foregoing conclusions the motions of the City and the State to dismiss the Complaint are denied.

It is so ordered.

New York, NY
July 27 , 2005

ROBERT W. SWEET
U.S.D.J.